```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    FOR THE NORTHERN DISTRICT OF TEXAS

 3                              DALLAS DIVISION

 4
      UNITED STATES OF AMERICA,     )        3:19-CR-112-K-2
 5               Government,        )
                                    )
 6                                  )
      VS.                           )        DALLAS, TEXAS
 7                                  )
                                    )
 8    JOHN MERVYN PRICE,            )
                 Defendant.         )        January 18, 2023
 9

10                    TRANSCRIPT OF SENTENCING HEARING

11                  BEFORE THE HONORABLE ED KINKEADE

12                    UNITED STATES DISTRICT JUDGE

13

14
      A P P E A R A N C E S:
15

16
      FOR THE GOVERNMENT:          MR. CHRISTOPHER FENTON
17                                 U.S. Department of Justice
                                   Criminal Division, Fraud Section
18                                 1400 New York Avenue NW
                                   Bond Building
19                                 Washington, DC  20005
                                   (202) 320-0539
20                                 christopher.fenton@usdoj.gov

21                                 MR. THEODORE M. KNELLER
                                   U.S. Department of Justice
22                                 Criminal Division, Fraud Section
                                   1400 New York Avenue NW
23                                 Bond Building
                                   Washington, DC  20005
24                                 (202) 514-5799
                                   theodore.kneller@usdoj.gov
25
```

```
 1                              MS. MARY F. WALTERS
                                U.S. Attorney's Office
 2                              1100 Commerce Street
                                Third Floor
 3                              Dallas, Texas  75242
                                (214) 659-8685
 4                              mary.walters@usdoj.gov

 5
    FOR THE DEFENDANT:          MR. DAVID M. FINN
 6                              David Finn
                                4015 Main Street
 7                              Suite 100
                                Dallas, Texas  75226
 8                              (214) 522-4500
                                judgefinn@davidfinn.com
 9

10                              MR. ROBERT L. WEBSTER
                                Robert L. Webster, Attorney
11                              7557 Rambler Road
                                Suite 525
12                              Dallas, Texas  75231
                                (214) 695-3670
13                              robert.webster@bobwebsterlaw.com

14

15

16

17

18
    COURT REPORTER:             MR. TODD ANDERSON, RMR, CRR
19                              United States Court Reporter
                                1100 Commerce St., Rm. 1625
20                              Dallas, Texas  75242
                                (214) 753-2170
21

22

23          Proceedings reported by mechanical stenography and

24     transcript produced by computer.

25
```

1          SENTENCING HEARING - JANUARY 18, 2023

2                  P R O C E E D I N G S

3          THE COURT:  Okay.  Now, John Price.

4          Let me see y'all at the side of the bench for a

5     second, Mr. Fenton, any of y'all -- all of y'all, Ms. Walters,

6     that want to come.

7          (Bench Conference off the record)

8          THE COURT:  Okay.  Case of United States of America

9     versus John Mervyn Price, Cause Number 3:19-CR-112-K.

10          Mr. Fenton and Mr. Kneller and Ms. Walters are here

11     for the Government, and they've announced ready, correct?

12          MR. KNELLER:  Correct, Your Honor.

13          THE COURT:  And Mr. Finn is here and Mr. Webster, and

14     y'all are ready?

15          (Pause)

16          THE COURT:  All right.

17          MR. FINN:  Testing.

18          THE COURT:  Okay.  Mr. Price, on June 11, 2020, you

19     pled guilty before United States Magistrate Judge Renee Toliver

20     to Counts One through Twenty-Two of a 23-count superseding

21     indictment.

22          Count One, conspiracy to commit mail and wire fraud;

23     Counts Two through Eleven, mail fraud; Count Twenty-Two, money

24     laundering and aiding and abetting.

25          There's no plea agreement.

 1                    I accepted your guilty plea on June 26 of 2020.

 2                    And I will dismiss the original indictment as to you.

 3                    We have an offense level 42, criminal history

 4     category I, with a guideline range of 430 years; Counts One

 5     through Twenty-One, zero to 20 years; Count Twenty-Two, zero to

 6     ten years.

 7                    And y'all agree to restitution; is that correct,

 8     Mr. Finn?

 9                    MR. FINN:  Yes, sir.

10                    THE COURT:  Of the $12,427,311.61.  Is that correct,

11     sir?

12                    MR. FINN:  Yes, Your Honor.

13                    THE COURT:  And yes, sir, Mr. --

14                    MR. FINN:  Yes, sir.

15                    THE COURT:  He needs to say it.

16                    THE DEFENDANT:  Yes, sir.

17                    THE COURT:  Okay.  All right.

18                    So -- and so other than that, both sides accept the

19     findings of the Probation Department and the presentence report

20     as the findings of the Court.

21                    I've got your sentencing memorandum where the

22     Government and the Defendant -- yours is 144 to 168 months, is

23     what you're asking me to sentence him.  And the Defendant is

24     asking for three years of probation.

25                    So I think that's where we are in this.

1              And I'm ready to hear anything you have in

2    mitigation.

3              MR. FINN:  May it please the Court, Judge, at this

4    time I would call my client's wife, who's in the courtroom,

5    Mrs. Price.

6              And if the Court would allow, could she take the

7    witness stand, Your Honor?

8              THE COURT:  Sure.

9              MR. FINN:  Thank you.

10             THE COURT:  Hi, Mrs. Price.  If you'll come up here.

11             MR. FINN:  Your Honor, may I?

12             THE COURT:  Sure.

13             (Pause)

14             THE COURT:  Mrs. Price, let me get you sworn in,

15    okay?

16             (The witness was sworn)

17             THE COURT:  Would you take a seat right here next to

18    me?

19             And, Mrs. Price, if you'll talk right into that

20    microphone, it will certainly be helpful.

21             THE WITNESS:  Okay.

22             THE COURT:  Okay.  Might want to pull it up a little

23    bit where it's -- there you go.

24             THE WITNESS:  Hello?  Testing.

25             THE COURT:  And the chair does not move, so you have

```
 1   to kind of move yourself up near it, okay?
 2            THE WITNESS:  Okay.
 3            THE COURT:  Thank you.
 4            MR. FINN:  Thank you, Judge Kinkeade.
 5            MARIAN PRICE, DEFENDANT'S WITNESS, SWORN
 6                     DIRECT EXAMINATION
 7   BY MR. FINN:
 8   Q.   Mrs. Price, you know the gentleman to my left, Mervyn
 9   Price, correct?
10   A.   Yes.
11   Q.   How long have you been married?
12   A.   We've been married for almost 23 years.
13   Q.   Twenty-three years?
14   A.   Yes.
15   Q.   And you work at Doug Rees in a civil law firm here in
16   Dallas; is that correct?
17   A.   Yes.
18   Q.   And you've been a legal assistant or a paralegal for a
19   number of years, correct?
20   A.   A long number of years, yes.
21   Q.   I won't ask you how many.  Don't worry.  I'm 59, so we're
22   in the same ballpark.
23            You've heard -- you were in the courtroom with your
24   husband earlier when Mr. Comu's team was presenting their case,
25   correct?
```

```
 1    A.   Yes.
 2    Q.   Mr. Price, your husband, has no criminal -- well, Judge
 3    Kinkeade told me once that, "Finn, you are a tow truck driver
 4    with a law license," okay?  So if that's true -- and I think it
 5    is true in some regards -- we've got an older model Chevrolet
 6    with a lot of miles on it, correct?
 7    A.   Yes.
 8    Q.   Is that right?
 9    A.   Yes.
10    Q.   But absolutely, positively no criminal history, correct?
11    A.   That's correct.
12    Q.   What kind of man has he been during these many years of
13    marriage?
14         Is he a -- because Judge Kinkeade hears it all, as
15    you can imagine, you know, wife beaters to saintly people.
16         Where does Mr. Price fall in that spectrum?  Because
17    Judge Kinkeade doesn't know him.
18    A.   Oh.  Well, he's a wonderful man.  He's -- he's always been
19    very kind to me.  He has a son and a grandson in the Cayman
20    Islands, and he's always been very kind to them.  He's done
21    charity work, you know, at church -- church things.
22    Q.   Right.
23    A.   And he's just -- he's always been just a wonderful man.
24    Q.   Now, Mrs. Price, you and I have known each other.  In
25    fact, Doug Rees and I were law school roommates at the
```

1    University of Texas School of Law down in Austin.  And you and

2    I have known each other since this case began, correct?

3    A.    Yes.

4    Q.    Several years?

5    A.    Yes.

6    Q.    And your husband pretty much fessed up and accepted

7    responsibility immediately, correct?

8    A.    Yes.

9    Q.    Unlike, perhaps, Mr. Comu who was busy trying to do things

10   while he was in custody and got caught on a recorded lie,

11   right?

12   A.    Yes.

13   Q.    So where do you two live now?  Because here's the thing.

14   The Judge is talking about $9 million, $12 million.  What kind

15   of ritzy gazebo do you and your husband live in?

16   A.    Well, we were living in a house.  We owned a house, and

17   then we couldn't keep up the payments on the house, so we had

18   to downsize to an apartment.  And now we're downsizing again,

19   so we're paying $1,600.00 a month in rent.

20   Q.    For a one-bedroom apartment over by Love Field?

21   A.    Over by Love Field, yes.

22   Q.    So you and your husband are not exactly living high on the

23   hog, as they say?

24   A.    We are not.

25   Q.    And has he tried to work, and he has worked while this

1  case has been pending?

2  A.   He has worked at times, yes.

3  Q.   Did he sell cars at some point?

4  A.   He was selling cars, yes.

5  Q.   And he was laid off recently, and he's looking for new

6  employment, correct?

7  A.   That's correct.

8  Q.   Did -- you and your husband, Mr. Price, were married with

9  all this EarthWater business going around.

10        Was your husband busy selling shares and dealing with

11  investors, or was his role in the company something different?

12  A.   He did not sell any of the shares himself.

13  Q.   Okay.  Was he in charge of making the product, marketing

14  the product, and actually delivering a real product?

15  A.   Yes.  He was involved in the ZenFul.

16  Q.   In the what?

17  A.   In the -- he made ZenFul.  He started ZenFul.  He was in

18  the -- he was out in the -- out in the plant where they made

19  the ZenFul.  He was there helping produce ZenFul.

20  Q.   Okay.  I don't want to confuse the Judge or myself.  We've

21  been hearing about EarthWater, but you're referring to

22  something else called ZenFul?

23  A.   Yes.

24  Q.   What is ZenFul?

25  A.   ZenFul is the clear drink that they were showing.

```
 1    Q.   Okay.  The clear as opposed to the muddy one?
 2    A.   Yeah.  Yeah.  And it had a very good flavor.  It was very
 3    tasty.
 4    Q.   And was your husband or the company able to sell some of
 5    that tasty stuff?
 6    A.   Well, Mervyn was trying to get it sold.  He was trying to
 7    go to grocery stores and get it on the shelves, but Mr. Comu
 8    did not want to sell it in the stores.  He wanted to sell it on
 9    Amazon, online only.
10    Q.   Was Comu, based on what you know, was he kind of the
11    wheeler-dealer mastermind of this whole thing?
12    A.   Yes.
13    Q.   Is he the one that made the lion's share of the money that
14    put crooked dirty dollars -- were they lying to investors
15    saying, "90 percent of your money is going to go into the
16    company," when, in fact, 50 percent was going to bonuses and
17    stuff?
18          Was it Comu making the big money, or was your
19    husband, Mr. Price, making the big money?
20    A.   No, Mr. Comu was making the big money.  Mervyn was just
21    making a salary.
22    Q.   Okay.  And what was that salary?
23    A.   He was making $5,000.00 a month.
24          MR. FINN:  Judge, may I approach the witness?
25          THE COURT:  Yes.
```

BY MR. FINN:

Q.   Mrs. Price, without going into any detail, I'm showing you what's been marked -- this is Government's Exhibit 1B, as in boy, from their sentencing memorandum.

        Do you recognize this?  I've written on it, but do you recognize this?

A.   Yes.

Q.   And the amount they're attributing to your husband where it says "payment cleared" is $679,550.00; is that correct?

A.   Yes.

Q.   So your husband made, according to the Government's calculations, $679,000.00 selling his own EarthWater shares, correct?

A.   Yes.

Q.   And that didn't take into -- doesn't reflect that Filippo, Russell Filippo, got a 30-percent cut for those sales, right?

A.   Right.  He had -- yeah.  We had to pay him out of that.

Q.   So your husband made in this $13 million Ponzi scheme, or whatever it was, fraud, about 4- to no more than $500,000.00, correct?

A.   That's correct.

Q.   Ma'am, would you tell the Court briefly, because it's in the presentence report, what kind of physical condition your husband is in?  And how old is he?

1    A.   My husband is 67 years old.  He suffers from diabetes.  He

2    has neuropathy.  He has high blood pressure.  He has bipolar

3    disorder.  He has a heart -- heart problem.  He's had two --

4    two hip replacements.  And he's had -- both of his retinas have

5    detached, and he's had them surgically repaired.

6    Q.   Other than that, he's just fine, huh?

7    A.   Yeah.  He takes nine medications every day.

8    Q.   Okay.  Mrs. Price, if you don't mind me asking you, how

9    about yourself?  What kind of shape are you in medically?  And

10   I believe you indicated to me yesterday or the day before --

11   and it's in the letter -- I dropped -- just so you know, I

12   dropped off all three letters -- three letters from you and two

13   from Mr. Price.

14   A.   Uh-huh.

15   Q.   I hand-delivered those to Judge Kinkeade yesterday just to

16   make sure that he got those.

17   A.   Yeah.

18   Q.   I'm pretty sure I sent them previously, but just to make

19   sure.

20        So you make reference in one of those letters to some

21   seizure disorder that you have.  Is it epilepsy or what?

22   A.   Well, the doctors have never been able to confirm to me

23   what I have.  I suffered my first seizure in 2014, and I

24   couldn't drive thereafter for three months to do anything.  I

25   had to be driven to work, driven to get groceries, you know.

```
 1    That was -- I couldn't drive at all.
 2    Q.   Who drove you?
 3    A.   My husband drove me, and Mervyn's son came up from the
 4    Cayman Islands.  His name is Philip.  And he drove me around as
 5    well.
 6    Q.   And the son is the one that had the wife die --
 7    A.   Uh-huh.
 8    Q.   -- in an automobile accident?
 9    A.   Yes.
10    Q.   Okay.  Did he take that -- your husband take that
11    particularly hard?
12    A.   Yes.  Oh, very hard, yes.
13    Q.   Now, my son has got epilepsy, and it's controlled by
14    medication.  So do you -- but you haven't been diagnosed with
15    epilepsy.  I mean, a seizure could just come on at any point?
16    A.   It could happen at any time, yes.
17    Q.   And who would be your primary caregiver if that happened?
18    A.   Mervyn.  I have nobody else.
19    Q.   It's pretty much you two against the world?
20    A.   Yeah.
21    Q.   And you're just hunkering down?
22    A.   Yeah, we're hunkering down.
23    Q.   Okay.
24         MR. FINN:  Judge, that's all I have.  But, Your
25    Honor, if you have any questions -- this is a good, God-fearing
```

```
 1   woman, and she'll shoot straight with you.

 2           THE COURT:  Any questions, Mr. Fenton?

 3           MR. FENTON:  No, Your Honor.

 4           THE COURT:  Thank you, ma'am.

 5           MR. FINN:  Thank you, Mrs. Price.

 6           THE COURT:  Appreciate it.

 7           (Pause)

 8           THE COURT:  Okay.

 9           MR. FINN:  Your Honor, at this time, I call my

10   client, Mervyn Price.

11           THE COURT:  All right.  Do you want to just question

12   him from there?

13           MR. FINN:  Yes, Judge.

14           Do you want to put him under oath, or no?

15           THE COURT:  Yeah, if he's going to be testifying.

16           MR. FINN:  Okay.

17           (The Defendant was sworn)

18           THE COURT:  Okay.

19            JOHN MERVYN PRICE, DEFENDANT, SWORN

20                    DIRECT EXAMINATION

21   BY MR. FINN:

22   Q.   Okay.  Mr. Price, you're kind of soft-spoken, and the

23   Judge has indicated acoustics in here are not -- are not that

24   good.

25   A.   Okay.
```

 1   Q.   You had the opportunity, thanks to Judge Kinkeade and the

 2   way he scheduled this, to be in the courtroom while the

 3   co-defendant, Mr. Comu, was making his case and his argument.

 4          What kind of guy was Comu really?  I mean, we heard

 5   what his lawyers put on, but I think you might have a different

 6   take on Mr. Comu.

 7   A.   Well --

 8   Q.   Speak up.

 9   A.   I was originally employed by Mr. Comu because I had a

10   history of operational control of the companies, fixing them

11   up.  And he had Regus Advisors, which was an advisory company,

12   two companies, small businesses, and he needed my talent.

13          I then stayed on with Mr. Comu as an employee as he

14   founded EarthWater, and I realized that EarthWater had a

15   potential to it if it was handled in the correct manner,

16   because there was already a competitor out there called BLK,

17   Black Water, which was doing very well indeed.  So we figured

18   that there was an opportunity for that.

19          During this period, Mr. Comu was always in control.

20   It did get fractured, and I won't go into all the details, but

21   I rented a home from Mr. Comu.  And there's all kinds of

22   problems and issues.  And in the end, the courts asked me if I

23   would offer to buy it, and I said yes.  And Mr. Comu didn't

24   like that, because he didn't want to lose the house.  And he

25   threatened my life by basically saying that he knows people who

```
 1    can do things to me that can do great harm.
 2              THE COURT:  Who owned the house that you were renting
 3    from him?  How did that work?
 4              THE DEFENDANT:  Comu.
 5              THE COURT:  Okay.  But he didn't like you buying it
 6    from --
 7              THE DEFENDANT:  No.  No, Your Honor.  I rented it
 8    from him when we were on good terms, and I rented out my own
 9    house in --
10              THE COURT:  Why?  Why didn't he just not sell it to
11    you?  I don't get the deal.
12              THE DEFENDANT:  Because he wasn't ready to sell it at
13    the time.  I offered to buy it, but he said, "No, rent it and
14    then buy.  We'll discuss the rent to buy."
15              So I rented it for two years from him.
16              THE COURT:  Why did he get mad?  I didn't understand
17    that.
18              THE DEFENDANT:  Because he was in the middle of a
19    $6 million bankruptcy case.
20              THE COURT:  Oh, and you were going to buy it out of
21    bankruptcy.  Oh, okay.  Okay.
22              THE DEFENDANT:  Correct.  Yes.
23              THE COURT:  You were going to buy it out from the
24    Judge or from the bankruptcy, and he didn't want you to do
25    that, correct?
```

1          THE DEFENDANT:  No.  He wanted me -- he wanted me to

2     buy it, but the bankruptcy proceedings didn't want him to sell

3     it.

4          THE COURT:  Oh, okay.

5          THE DEFENDANT:  So -- and not only sell it, he tried

6     to prove homestead rights by saying he was living there.

7          THE COURT:  Yeah.

8          THE DEFENDANT:  And I basically said no, he wasn't;

9     I'm living there, and I'm offering to buy it from him.

10    BY MR. FINN:

11    Q.   And did that make him angry?

12         THE COURT:  And that made him mad?

13         THE WITNESS:  Well, he lost a four and a --

14    $450,000.00 home, yes.

15         THE COURT:  I get it.

16    BY MR. FINN:

17    Q.   Because of what you said?

18    A.   Well, actually my wife.  My wife was on the stand, and she

19    just told the truth.

20         THE COURT:  Okay.

21    BY MR. FINN:

22    Q.   She told the truth, and it cost him 400 grand.  Comu got

23    all hacked off.

24         And, you know, what did you do for the company?  I

25    mean, were you out there selling shares to these investors and

1   stuff, or was your role something different?  And be brief
2   because the Judge has heard a lot about this.
3   A.   Okay.  I was very concerned about the viability of the
4   product, because it was originally packaged in milk bottles and
5   sent out as a kind of sample just for people to look at to
6   solicit capital.  And to be honest, I was one of those four
7   soliciting capital, Judge.
8              I realized that there was a product here.  I spoke to
9   Dr. Norbert Chirase and realized that he was providing the
10  fulvic acid and the humic acid to the competitor, and they were
11  doing very well.
12  Q.   And just -- let me stop you.  That's Dr. Chirase that
13  testified --
14  A.   That's right.
15  Q.   -- an hour ago in front of Judge Kinkeade?
16             You knew that guy?
17  A.   Very well indeed.  I dealt with him almost on a daily
18  basis.
19  Q.   Who else at EarthWater was doing these -- you know,
20  manufacturing?  Because it sounds like you were the only one
21  that was actually producing anything.
22  A.   Well, I exclusively took over the responsibility for
23  production, for marketing, for sales, and for getting it onto
24  shelves.  I got it on to Sprouts, Central Market.  I was
25  working Costco.  That's -- the white one was for Costco.  So I

1    was making progress.

2          And as I was making progress, the efforts I was

3    making, C.J. was elevating and lying about them, saying that we

4    were -- we were already selling to Costco, that we already sold

5    our first million bottle.

6    Q.   So he was exaggerating to the point of deception?

7    A.   Correct.  Constant deception, and also deceiving the FDA

8    and the USDA, which caused me terrible grief.  I had to make

9    amends with those and work out.  What I had to do in the end

10   was go back and re-engineer the black product and put it

11   through a pasturization process and then get FDA and USDA

12   approval through that process.

13   Q.   Was this before or after you and Comu split?

14   A.   Oh, no, no, no.  This was long before.

15   Q.   Okay.  Because when was the split?

16   A.   I'll never forget it.  September the 30th, 2016.

17   Q.   What was that split over?

18   A.   We'd just basically fallen out.  It wasn't working at all

19   anymore.  He didn't like the fact that I had got FulHum and I

20   got a massive amount of high -- everyone was interested in a

21   clear version of fulvic, and I was beginning to get Dr. Chirase

22   and a number of other scientists to write papers on it that we

23   could publish on the benefits of just fulvic.  I said -- he

24   basically -- just to be honest, he just wanted a pump and dump.

25   Q.   Okay.  So it's a pump and dump.

1    A.    Yeah.

2    Q.    You immediately, when confronted, accepted responsibility.

3    The Government will say that you weren't 100 percent honest.

4    But you pretty much came clean.  And I was there for that three

5    years ago.  Do you remember that?

6    A.    Yeah.  I wasn't honest because I genuinely was afraid of

7    what Comu would do, and I needed that paycheck badly, that

8    paycheck every month.  I had 60-something years of age.  I had

9    no chance of getting another job.  And I knew I could get

10   fulvic and humic into a stable position where it would have

11   value to sell to another company.

12   Q.    I got you, Mr. Price, but let me focus you on this.

13          We've heard or the Judge has heard that when Mr. Comu

14   was out on pretrial release he was doing some stuff he

15   shouldn't have been doing.

16   A.    Uh-huh.

17   Q.    You haven't had any problems in three years since you've

18   been released, correct?  No problems, you know?

19   A.    On September 30, 2016, I severed all communications with

20   all my friends, everybody I knew, Comu, and anyone else, and I

21   started a new life.  I went to church, and I said, "What do I

22   do?"

23          And they said, "Start all over.  Pretend you're a

24   kid.  Do any job you can."

25          And I thought, well, I've never sold cars.  I've

1    never been in retail.

2            I worked for $17.00 an hour, and that's basically

3    what I did, and I started all over.  And I've had no contact

4    with anyone since then.

5    Q.   And you have sold cars for 17 bucks an hour?

6    A.   No.  I sold cars for commission.  But in the end, if I

7    didn't sell a car, I got 17 bucks an hour.

8    Q.   Okay.  But you got laid off, and now you're looking for a

9    new job?

10   A.   Yeah.  Unfortunately, the interest rates have forced the

11   car dealerships into some disarray right now, and I was laid

12   off.

13   Q.   Okay.  Earlier I had your wife go over Government's

14   Exhibit Number 1B --

15   A.   Yeah.

16   Q.   -- which shows -- it says investor deposits to Mervyn

17   Price Associates LLC, bank account ending in 3847.  And the

18   figure that the Government has for payment cleared, meaning

19   payment to your account, was $679,000.00.  Is that correct?

20   That's what you made on --

21   A.   That's --

22   Q.   Hold on.  Let me finish.

23            And that's the shares of your EarthWater stock

24   that -- what's that fellow's name that sold them for you?

25   A.   Russell Filippo.

```
 1   Q.   Russell Filippo.  He sold your shares to the tune of 679
 2   minus his 30 percent.
 3            Is that the money that you made from EarthWater?  I'm
 4   not talking about your salary.
 5   A.   No.
 6   Q.   Okay.  I know that was 6,000 bucks or something for --
 7   A.   No, it was nothing during this period.
 8   Q.   Okay.  So this money, this 4 -- 679 minus the 30 percent,
 9   that's the money that you made from EarthWater shares of
10   selling your own shares?
11   A.   They --
12   Q.   Is that right?
13   A.   They were my own shares, and I confirmed that.
14   EarthWater's own counsel told me that they were my shares to
15   sell.
16   Q.   The attorney's name is?
17   A.   Larry Friedman.
18   Q.   Larry Friedman told you you could go ahead and sell --
19   A.   He wrote up the separation agreement, and he was adamant
20   that I could sell.  I wasn't exactly trusting --
21   Q.   Slow down.
22   A.   -- so I contacted an attorney called Laura Holmes, who's a
23   securities attorney.  I gave her a copy of the separation
24   agreement, and I said, "Am I qualified to be able to -- do I
25   own these shares, and can I sell them?"
```

```
 1                And she said, "Well, you do own them," she said, "but
 2    you can only sell them in a certain way."
 3                And I said, "Will that require a broker?"
 4                She said, "It will require -- you can't sell it
 5    because you're not licensed to, even though they're yours."
 6                So that's why Russell Filippo came in, and I hired
 7    Russell.
 8    Q.   You hired Russell Filippo to sell your shares of
 9    EarthWater?
10    A.   Yes.
11    Q.   And he did to the tune of 679,000 minus 30 percent, more
12    or less, right?
13    A.   Yeah.
14    Q.   So if the Judge is sitting up there scratching his head,
15    going, wait a minute, $9 million, $12 million, and you made
16    less than half a million, where the heck did all this investor
17    money go?
18    A.   Well, I didn't know -- when we first formed this, I was so
19    busy trying to make product, I wasn't --
20    Q.   Wait, wait, wait, wait, wait.
21    A.   50 percent went to --
22    Q.   Wait, wait, wait.
23    A.   Okay.
24    Q.   Answer the dadgum question.  Where -- based on everything
25    that you know -- and if you don't know, fine to say, "I don't
```

1    know."  But you've heard investors, and you've read about
2    investors getting ripped off, and they're hacked off.
3           Where the -- and you made 4-, 5-, 600 grand off this
4    thing selling your own shares.  Where the heck did the money
5    go?
6    A.   I really don't know where it all went.  I really don't.  I
7    only know what I was using in the factory and what I was being
8    paid.  I had no -- I had no access to the accounting
9    whatsoever.
10   Q.   Okay.  But you weren't out there shaking people down
11   and -- well, I think the Government says you did shake a guy
12   down who indicated that -- what --
13           MR. FINN:  Judge, may I?
14           THE COURT:  Yeah.
15           (Discussion off the record between counsel)
16   BY MR. FINN:
17   Q.   Yeah, a Mr. Caulfield.  Do you remember him?
18   A.   I do indeed.  And I did not shake him down.
19   Q.   Okay.  And he's a bookie.  You didn't know this, but he's
20   also got a murder conviction.  He got probation somehow.
21           But were you out there selling shares, or was
22   somebody else doing that to these investors?
23   A.   In the case of Mr. Caulfield, Greg Palmachi, an agent of
24   ours, sold the shares to Mr. Caulfield.  Mr. Caulfield merely
25   wanted validation that there was a product and we were making

1    something and there was a real factory.  That is really where

2    it started, because I represented the manufacturing process.

3    Q.   So that's -- when you would baby-sit an investor who was

4    concerned, that was part -- I mean, you baby-sat the high-needs

5    investor sometime, take them out to lunch, tell him everything

6    is going to be fine?

7    A.   I showed him the factory.

8    Q.   You showed him the factory?

9    A.   Showed -- some investors I showed the factory.  John

10   Caulfield wouldn't come down.

11          I gave them a walk, a guided tour of the factory if

12   they --

13   Q.   Where was this factory?

14   A.   Harry Hines and Northwest Highway, a building just --

15   Q.   I know, yeah, Korea Town.

16   A.   Just made --

17   Q.   Okay.  And you would actually show investors, "Hey, this

18   is where your money is going"?

19   A.   Yeah, and do videos and send the videos.

20   Q.   Did Comu ever do that?

21   A.   I have no idea.  He was banned from the factory.

22   Q.   Whoa.  You banned him from the factory?

23   A.   No, I didn't.  The factory owner banned him.

24   Q.   Why?

25   A.   They just didn't get on, because Comu is making demands

1   that were impossible to do in manufacturing.

2   Q.   Okay.

3           MR. FINN:  One last thing, Your Honor.

4   BY MR. FINN:

5   Q.   On February 26th, 2018, which is a Monday, you sent

6   yourself an email.

7           MR. FINN:  And this is Government's Exhibit Number 5,

8   Your Honor.  It's already in the record in the sentencing

9   memorandum.

10  BY MR. FINN:

11  Q.   "20 sordid facts about Comu, Barnes, and EarthWater they

12  will never tell you."

13  A.   Yeah.

14  Q.   Why did you -- and I'm going to ask -- I'll ask the Judge

15  for permission to approach.  I'm sure the Government won't

16  oppose me offering this or showing it to the Judge.  It's

17  already in evidence.  But you pretty much laid it out that this

18  is a bunch of crooks, bailing wire and duct tape, and they're

19  not to be trusted.

20          What motivated you on February 26, 2018, to write

21  this?

22  A.   Fear.  I was wanting to blow the whistle, because I knew

23  by then how wrong it all was and how I had been led down the

24  path by Comu.  And I was extremely resentful and angry, and I

25  don't normally write things in anger, so I sent it to myself

```
 1    rather than send it to anyone else.
 2    Q.   I mean, this is like written by the prosecution in this
 3    case.  They couldn't have done -- well, maybe they could have
 4    done a better job.  But this pretty much says that Comu lives a
 5    very lavish lifestyle on investor money.  The company only sold
 6    $40,000.00 worth of product in 2017.  EarthWater pays for
 7    everything for Comu.  Comu is --
 8              MR. FINN:  Judge, may I approach and hand this to
 9    you?
10              THE COURT:  Yeah.  What -- have y'all agreed to this
11    exhibit?
12              MR. FENTON:  Yes, Your Honor.  It's a Government
13    exhibit.
14              THE COURT:  It's your exhibit, right?
15              MR. FENTON:  Yes.
16              THE COURT:  And it's Exhibit Number --
17              MR. FINN:  5, Judge.
18              THE COURT:  All right.  Great.
19              MR. FINN:  From their --
20              THE COURT:  Then it's already in evidence --
21              MR. FINN:  Yes, sir.
22              THE COURT:  -- but that certainly is admitted.  Okay.
23    BY MR. FINN:
24    Q.   All right.  Well, look, we're here because you made a
25    bunch of mistakes that happened to be criminal mistakes.  We're
```

1    all sinners.  I'm at the head of that pack, as the Judge well

2    knows.

3    A.   Yes, sir.

4    Q.   You accepted responsibility early on.  We didn't fight

5    this.  We didn't file a million objections to the PSR.

6              You know, have you ever heard that old saying you

7    can't put lipstick on a pig?

8    A.   Yes, sir.

9    Q.   Okay.  Well, I'm not calling you a pig, but I'm calling

10   EarthWater a pig.  And at some point, Merv, you realized if you

11   didn't go in knowing that this was smoke and mirrors and B.S.,

12   at some point that little voice went off in your head saying,

13   hey, something ain't right here.  And instead of getting out,

14   you kind of powered on for a little bit, right?

15   A.   Correct.

16   Q.   Tell the Judge -- here's the ringing question.  Why didn't

17   you listen to that little voice in the back of your head?  You

18   know, it's like me being an old guy.  Before I send something

19   on Facebook's and I -- or social media, there's that little

20   voice saying, "David, don't push send."

21   A.   Uh-huh.

22   Q.   Why didn't you bail the heck out of this thing?

23   A.   I was in considerably bad health at the time, and I needed

24   the paycheck.  I knew my health I was in, there was no way I

25   could get another job.  The stress of running the factory and

```
 1   getting things -- and cleaning up behind Comu and what he was
 2   doing was just too much for me.  I needed a paycheck.  So what
 3   I did, I moved myself to the factory and worked from there in
 4   an office where I wasn't on a day-to-day basis with Comu.
 5   Q.   Now, did you on a couple, two or three occasions --
 6            MR. FINN:  And I know I said I was almost done, and I
 7   am, Judge.
 8   BY MR. FINN:
 9   Q.   -- do an anonymous complaint to the SEC consistent with
10   that email I showed to the Judge saying fraud, fraud, alert,
11   alert?  Did you do that?
12   A.   To the SEC, yeah.  I tried to, yes.  It's very difficult
13   to do an anonymous complaint to the SEC online, but I did my
14   best three times.
15   Q.   Why not call -- pick up the phone and call the FBI?
16   A.   I didn't have the phone number, and it never occurred to
17   me.  I did actually put the parcel together and took it to the
18   FBI building, this building, but I didn't realize there was
19   another FBI.
20   Q.   Okay.
21   A.   I'm just ignorant.  I don't come from here.
22   Q.   Right.  How old are you, again?
23   A.   67, Your Honor.
24   Q.   Prior to this, Merv, how many times have you been in
25   trouble with the law?
```

```
 1    A.    I have a DUI from 2002.

 2    Q.    You got probation?

 3    A.    I did.  I got a year's probation.

 4    Q.    Been on the wagon since then or --

 5    A.    No, not necessarily.

 6    Q.    You're talking to a guy on the wagon.

 7    A.    Okay.

 8    Q.    So you're --

 9    A.    No, I have an occasional beer, but not very often.

10    Q.    Okay.  So that's not a problem?

11    A.    No.

12    Q.    Illegal drugs is not a problem?

13    A.    No.

14    Q.    You don't have a bunch of IRS people knocking your door

15    down?  You're not a fraudster or a shyster like Comu.  You

16    don't have that kind of baggage, right?

17    A.    No, I don't.

18    Q.    So what are you asking -- Judge Kinkeade has been around

19    the block a time or two.  He's heard it all.  He's even one of

20    the few federal judges that did criminal defense work.  Don't

21    tell anyone.  So he's been around.  He's seen this from the

22    State and the Federal level.

23          What do you want him to know about you?

24    A.    I did write the Judge a letter, and there is -- and I will

25    elaborate a little bit.  Within the period from September 2016
```

 1   to about 2019, I had a little bit of money.  And some friends
 2   of mine said, "We've got a great investment.  Put some money
 3   into this, and we'll buy aviation jet fuel and we'll resell
 4   it."
 5   Q.   Okay.
 6   A.   "And we'll resell it."
 7        I lost $20,000.00.  My own friends ripped me off.
 8   That was a catalytic moment, because I realized I had just
 9   taken that money from my wife, my family, from me, and I
10   realized how much the investors of EarthWater must generally
11   feel, because it's a terrible feeling to be ripped off, to know
12   you've been taken as a sap and as a fool.
13        And I thought I will do everything I can to make
14   restitution to these people, because no one is making
15   restitution to me.  I did it by prayer.  And I prayed for my
16   friends, and I forgave them.  No one is going to do that for
17   me.
18   Q.   But when the shoe is on the other foot, you're getting
19   ripped off, it doesn't feel too good, right?
20   A.   It certainly doesn't.  It's a terrible feeling.
21        MR. FINN:  I believe that's all, Your Honor.
22        THE COURT:  Thanks.
23        All right.  Government, questions?
24        MR. FENTON:  No, Your Honor.
25        THE COURT:  All right.  Thank you.

1              You can have a seat, sir, both of y'all.

2              And let me hear from the Government.

3              And I'm going to say to both of you, I'm going to

4    consider what I heard in the first case, the part that applies

5    to this gentleman, okay?

6              MR. FINN:  Thank you, Judge.

7              THE COURT:  Both sides agree to that?

8              MR. FINN:  Agreed.

9              MR. FENTON:  Yes, Your Honor.

10             THE COURT:  Okay.  Thanks.

11             Mr. Fenton?

12             MR. FENTON:  And we also -- just as a housekeeping

13   point, we just want to make sure that Mr. Webster made an

14   appearance on the record as well.

15             MR. FINN:  He's here.  He's in the courtroom.

16             MR. FENTON:  But that's on the record?  Okay.

17             THE COURT:  Yes.

18             MR. FENTON:  Okay.  I just wanted to make sure that

19   we get that.

20             THE COURT:  You're afraid I shouldn't let him sit

21   back there?

22             MR. FENTON:  Your Honor, I think there's three points

23   to make here.  One is Mr. Price just got up here and completely

24   misrepresented his role in the company.  His position was that

25   he had nothing to do with the promoters, nothing to do with

1    paying these people who are getting these exorbitant

2    commissions.  He just handled the -- he just handled the

3    factory and tried to make the product.  And when you look at

4    Government's Exhibit 2 and 3, those exhibits show Mr. Price

5    talking about preparing the private placement memorandum which

6    made representations about how EarthWater spent the money.

7             And also in Exhibit 3 you see Mr. Price receiving the

8    invoices from the promoters asking for the 50-percent

9    commissions, and you show him exercising control, spending

10   authority over the bank accounts.

11            That is completely different than what Mr. Price just

12   said.

13            The second thing is, unlike Mr. Comu who claims to

14   have believed in the product, Government's Exhibit 5 shows that

15   Mr. Price didn't believe in the product and that he, in fact,

16   knew that the product itself was a fraud.

17            And in addition to all the things that he said about

18   Comu, the first few things that he said was, "The company only

19   sold $40,000.00 worth of product in 2017."

20            THE COURT:  Uh-huh.

21            MR. FENTON:  "The product FulHum is not alkaline.  It

22   is neutral, and it's slightly acidic and does not contain all

23   of the minerals Comu claims it does."

24            Third, "FulHum is not made from fulvic acid alone.

25   Its greater constituent is lignum sulphate from wood pulp."

1          And this is from an individual who just tells you

2    that he's ignorant.

3          Fourth, "The product is the same as can be found on

4    the floor of any coal mine, dirty water," what I believe four

5    or five exclamation points there.  That's about the product.

6          He then goes on to talk about the fact that there's

7    all these illegal stock sales, they pay too much commission

8    that's illegal, it's unregistered.

9          And Mr. -- Mr. Finn is correct that this, you know,

10   basically reads like allegations from the indictment.  But the

11   point here is that Mr. Price did not believe in the product,

12   and that's evidenced here.  He knew that it was dirty water

13   from the floor of a coal mine.

14         What's really important is that Mr. Price just told

15   you that on September 30, 2016, he parted ways with C.J. Comu

16   and started a new life.  This email, Your Honor, was written on

17   February 26, 2018.

18         Exhibit 1B shows that --

19         THE COURT:  Your Exhibit 1B?

20         MR. FENTON:  My -- Government's Exhibit 1B shows that

21   after Mr. Price wrote this email, he sold $183,550.00 worth of

22   his personal shares of EarthWater stock to victims after he

23   wrote that email.

24         That's remarkable.  That tells you exactly who

25   Mr. Price is.

1          And the fact that he gets up here today and tells you

2    that on September 30, 2016, he turned over a new leaf in the

3    face of that evidence tells you who he still is today.

4          The final point that I will make is the cruelty, the

5    cruelty with which Mr. Price approached his victims.

6          You heard from Mrs. Price, you heard from Mr. Price

7    about the medical conditions that they suffer from and how

8    those medical conditions really have changed their lives.

9          Well, Mr. Price's victims suffered from medical

10   conditions.  And, in fact, Mr. Caulfield -- according to

11   Mr. Price, Mr. Caulfield had some huge -- all caps -- huge

12   medical issues recently and has been reduced to almost zero

13   financially, and he no longer works, so I can understand,

14   Mr. Price said, why he is desperate, but I will cope with it.

15   I will still take him out and just give him food and just feed

16   him lies so that he doesn't go and blow the whistle.  He will

17   cope with it.

18         The words that he uses to describe the victim, huge

19   medical issues, reduced to zero, desperate, he's going to cope,

20   he's going to deal with it, that tells you who Mr. Price is.

21   That is -- that is everything.

22         He took money from these people.  He continued to

23   take money from these people.  He's standing here today

24   lying -- even though he came in early, lying about the role

25   that he played and lying about the new leaf that he turned

1    over.  He has done none of those things.

2              And the fact that he continues to be dishonest about

3    it shows that he is entitled to the sentence that the

4    Government has asked for.

5              And whereas he may have done things that were

6    different than Mr. Comu after Mr. Comu was arrested, he didn't

7    go and try to orchestrate a stock deal and do things of that

8    nature, the fact that he stood up here today and told you the

9    lies that he told you in the face of absolute black and white

10   documentary evidence that is not in dispute means that he

11   should get the sentence that the Government has asked for.

12             THE COURT:  Okay.  Anything else, Mr. Finn?

13             MR. FINN:  Your Honor, I would just add my guy is

14   nothing like Comu.  And for them to suggest that they're peas

15   in a pod on the same -- on the same planet is frankly absurd.

16             THE COURT:  Okay.  Considering what I heard today,

17   both from the first hearing and this hearing, the guidelines,

18   the factors of 3553(a), and what I've heard today, and the

19   argument by both Mr. Fenton and by Mr. Finn, it's the judgment

20   of the Court you be sentenced to the custody of the United

21   States Bureau of Prisons for a term of 72 months.

22             I don't know if you have any time credit service, but

23   I'll give you that.

24             That's on -- and this is on all counts, to run

25   concurrently.

1            You'll need to pay the restitution of $12,427,311.61.

2            And you'll need to be on supervised release for a

3    period of three years.

4            You'll have to pay $2,200.00 in special assessment,

5    which is required by law.

6            Your restitution will be paid jointly and severally

7    with Mr. Comu, Barnes -- Mr. Barnes, Kadish, Green, Gagnier,

8    Duchinsky, Duplain, Filippo, and Mr. Rothman, payable to the

9    United States District Clerk, 1100 Commerce Street, Room 1452,

10   Dallas 75242.

11           Payable immediately, and any unpaid balance shall be

12   payable during incarceration.

13           Anything will be disbursed to the victims on the

14   attached list, which you've acknowledged.

15           If upon commencement of the term of supervised

16   release any part of the restitution remains unpaid, you shall

17   make payments on the unpaid balance in monthly installments of

18   not less than 10 percent of your gross monthly income or at a

19   rate of not less than $50.00 a month, whichever is greater.

20           Payment shall begin no later than 60 days after

21   you're released from confinement and shall continue each month

22   thereafter until the balance is paid in full.

23           And at least 50 percent of the receipts from gifts,

24   tax refunds, inheritances, bonuses, lawsuit awards, any other

25   receipt of money shall be paid toward the unpaid balance within

1    15 days of receipt.

2              Shall not affect the ability of the United States to

3    immediately collect payment in full through garnishment,

4    Treasury Offset Program, Inmate Financial Responsibility

5    Program, the Federal Debt Collection Procedures Act of 1990,

6    any other means available under federal or state law.

7              I'm waiving any interest.

8              I'm not ordering a fine.  I would rather you pay some

9    of this back.

10             And the terms of supervision set forth in

11   Miscellaneous Order 64 and outlined in Part G of the

12   presentence report will apply to you except as I have modified

13   by the facts and the addendum and any facts found by the Court

14   during this sentencing hearing.  And you shall comply with

15   these conditions during the term of supervision.

16             I'm recommending Seagoville.

17             I am -- I will put in the record that one of the --

18   and you'll need to report on or before March 1, 2023, before

19   2:00.

20             If that date -- if there's a problem with that date,

21   I'll work -- we'll work with Mr. Finn to get a date.

22             I will tell you that when you sold yours and you

23   didn't pay anything to try to pay any of these people back or

24   make any effort to do that, that hurt.  That hurt you.

25             And you were more involved, I think, than -- you

```
 1   know, based on what the evidence shows and what the Government
 2   shows.  You weren't as bad as Mr. Comu, and I didn't give you
 3   the same time he got either.
 4             I think that's it.
 5             Anything you want me to -- else to do, Mr. Finn?
 6             MR. FINN:  No, sir.
 7             THE COURT:  Anything from the Government?
 8             MR. FENTON:  No, Your Honor.
 9             THE COURT:  Okay.  Thank y'all.
10             Y'all are all excused.  Thank you.
11             SECURITY OFFICER:  All rise.
12             (Hearing adjourned)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                                INDEX

 2    Court's ruling........................................ 36

 3                                                      Further
                      Direct   Cross   Redirect   Recross  Redirect
 4
      WITNESS FOR THE
 5    DEFENDANT

 6    MARIAN PRICE           6

 7    JOHN MERVYN PRICE     14

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1        I, TODD ANDERSON, United States Court Reporter for the

2    United States District Court in and for the Northern District

3    of Texas, Dallas Division, hereby certify that the above and

4    foregoing contains a true and correct transcription of the

5    proceedings in the above entitled and numbered cause.

6        WITNESS MY HAND on this 22nd day of January, 2023.

7

8

9
                                 /s/Todd Anderson
10                               TODD ANDERSON, RMR, CRR
                                 United States Court Reporter
11                               1100 Commerce St., Rm. 1625
                                 Dallas, Texas  75242
12                               (214) 753-2170

13

14

15

16

17

18

19

20

21

22

23

24

25